# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| **CRYSTAL MENDOZA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | 2:22-cv-00477-MHT-JTA |
| **QCHC, INC.,** | ) | (WO) |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## ORDER ON PRETRIAL HEARING

A pretrial hearing was held in this case on July 10, 2025, at 10:00 a.m. by video conference.

**1.   PARTIES AND TRIAL COUNSEL:**

    a.   Counsel for the Plaintiff, Crystal Mendoza:

| Name | Postal and Email Address | Telephone No. |
|---|---|---|
| Henry F. ("Hank") Sherrod III | 119 S. Court Street Florence, AL 35630 hank@alcivilrights.com | 256-764-4141 |

    b.   Counsel for Defendant QCHC, Inc.:

| Name | Postal and Email Address | Telephone No. |
|---|---|---|
| LaBella S. McCallum<br>Eric D. Hoaglund | 905 Montgomery Hwy, Ste 201 Vestavia Hills, AL 35216 lsm@mhmfirm.com edh@mhmfirm.com | 205-824-7767 |

**COUNSEL APPEARING AT PRETRIAL HEARING:**

    a.    Counsel for the Plaintiff, Crystal Mendoza:

| Name | Postal and Email Address | Telephone No. |
|---|---|---|
| Henry F. ("Hank") Sherrod III | 119 S. Court Street Florence, AL 35630 hank@alcivilrights.com | 256-764-4141 |

    b.    Counsel for Defendant QCHC, Inc.:

| Name | Postal and Email Address | Telephone No. |
|---|---|---|
| LaBella S. McCallum Eric D. Hoaglund | 905 Montgomery Hwy, Ste 201 Vestavia Hills, AL 35216 lsm@mhmfirm.com edh@mhmfirm.com | 205-824-7767 |

2. **JURISDICTION AND VENUE:**

Jurisdiction and venue are both proper in this Court pursuant to 28 U.S.C. §§1331 and 1343(a)(3). No jurisdictional questions remain.

3. **PLEADINGS:**

   a. Plaintiff's Complaint [Doc. 1].
   b. Defendant QCHC's Answer to Complaint [Doc. 10].
   c. Plaintiff's First Amended Complaint [Doc. 64].

   **Pending Motions:**

   a. Motion for Summary Judgment of Defendant QCHC, RN [Doc. 168].

4. **CONTENTIONS OF THE PARTIES:**

   A. **The Plaintiff:**

Plaintiff Crystal Mendoza is an insulin-dependent diabetic. Mendoza is also a drug addict and has mental health issues. Despite her struggles with drug addiction and mental illness, Mendoza has managed her diabetes because it is a matter of life or death for her. She carries a glucose meter and checks her blood sugar as many as six times per day–when she gets up, at bedtime, in connection with meals, in between meals, and other times based on how she feels. She administers a certain insulin dosage (via a syringe in her stomach) with food and a varying dosage after a meal and at other times based on a written chart (referred to as a "sliding scale"). Using the sliding scale to determine the insulin dosage, Mendoza administers insulin if her blood sugar is high (above 170) and takes a sugar shot if her blood sugar is low (below 70).

Even when Mendoza properly monitors her glucose levels, she is at risk for complications because of the difficult nature of her diabetes, sometimes referred to as insulin-resistant diabetes.

3

Because of her insulin-resistant diabetes, Mendoza does not use regular insulin and requires a special insulin regimen.

When Mendoza was arrested late in the day on August 10, 2020, Mendoza was taking her mental health medication as prescribed and was monitoring and managing her diabetes. Mendoza's doctor had recently modified Mendoza's insulin regimen, and Mendoza had filled that prescription roughly a week prior to her arrest.

At the Montgomery County Jail, Mendoza was placed in a holding cell in the front of the jail. The nurse on shift at the time was Kelisha Thomas, an LPN. Thomas treated Mendoza until her shift ended on August 11, 2020, at 6:30 a.m.

According to Thomas, the standard of care applicable to her treatment of Mendoza:

- prohibited her from administering insulin against Mendoza's will;
- required her to administer the correct type of insulin;
- required regular monitoring of Mendoza's blood sugar;
- required her to do a complete assessment of Mendoza, including vital signs and medical history; and
- required her to implement a diabetic diet for Mendoza.

Thomas violated the standard of care.

Mendoza had three interactions with Thomas on August 10 and August 11. During the initial visit, Mendoza told Thomas about her diabetes and the type of insulin Mendoza took, but Thomas did not check Mendoza's glucose level or vital signs.

During the second, Thomas came to the cell, and Mendoza told her she needed her insulin and that she did not feel well. Thomas again did not check Mendoza's glucose levels or vital signs or otherwise assess Mendoza.

The third interaction followed Mendoza's screaming for help because she was in medical

distress from high blood sugar. Mendoza was defecating and urinating on herself. Mendoza could not stand. Thomas did not check Mendoza's vital signs but did check her glucose level. When Mendoza saw that Thomas was about to inject her with the wrong insulin, Mendoza objected and again told Thomas about the prescription insulin she required. Thomas ignored Mendoza's objections and had two guards hold Mendoza down while Thomas administered the wrong insulin against Mendoza's will.

Thomas did not implement a diabetic diet.

Thomas did not create any medical records regarding her treatment of Mendoza.

According to Thomas, she had multiple phone communications with the QCHC physician regarding Mendoza. Among other things, Thomas says the QCHC physician (Andrews) initially ordered regular insulin contrary to Mendoza's prescription and later determined that Mendoza required treatment in a hospital and issued that order. The supervisor over the jail, Sonja Pritchett, however, refused to have Mendoza taken to the hospital and informed Thomas that Mendoza would not be taken to the hospital. Thomas in turn informed her boss, the QCHC administrator for the jail, Katrina James. QCHC acquiesced in the jail decision to deny Mendoza transfer to a hospital.

Thomas admits she did not get complete vital signs from Mendoza and that she did not do a complete assessment of Mendoza. Thomas admits she administered regular insulin and that she did so while Mendoza was being held by two officers.

Thomas breached the standard of care by administering the wrong insulin and by doing so against Mendoza's will, aggravating Mendoza's condition.

Mendoza's condition at the time of the third visit obviously required treatment in a hospital. Mendoza was in ketoacidosis, a life-threatening condition that requires evaulation and treatment in a hospital. Thomas breached the standard of care to the extent she failed to take

action to get Mendoza to the hospital.

Due to the actions and inactions of Thomas, Andrews, James, and other QCHC personnel, Mendoza was not transferred to the hospital in a timely manner.

After Mendoza was denied transfer to the hospital, Mendoza was moved to another cell and was allowed to suffer until she became non-responsive.

As Mendoza's condition deteriorated, Mendoza received no further medical treatment from Thomas, Andrews, or any other QCHC medical provider. She did not receive insulin. No one checked her blood sugar. She did not eat.

On August 13, 2020, over two days after Thomas last saw Mendoza, Mendoza was found non-responsive and taken by ambulance to Jackson Hospital.

According to Thomas, it was "common" for the jail to refuse to follow a doctor's order to send an inmate to the hospital. Thomas was aware of inmates not being sent to the hospital "over seven times." Because QCHC acquiesced in the jail's practice of not transferring inmates to the hospital, the jail's deliberately-indifferent policy and custom was QCHC's as well.

Because Mendoza was not promptly taken to the hospital, she almost died. She was initially hospitalized in a diabetic coma that lasted roughly 2 weeks and developed a severe bed sore as a result. She required a second hospitalization, physical therapy, wound care, and numerous visits to medical providers over many months. The incident has had a lasting impact on Mendoza. She has a scar from the bed sore. It exacerbated her pre-existing anxiety, depression, and PTSD. She continues to have leg issues, including weakness and pain that affect her mobility and sleep.

**B.** **The Defendants**:

    *1.*     *Contentions of QCHC, Inc.*

Crystal Mendoza was arrested late in the day on August 10, 2020, and held in the

6

Montgomery County Jail until August 13, 2020, when she was taken by ambulance to Jackson Hospital. Prior to August 10, 2020, Plaintiff admits she had a long history of drug problems beginning at age 15 or 16 and addiction issues and that these issues persisted on the date of her arrest. In addition, Plaintiff suffered from a history of mental illness prior to her arrest, including a diagnosis for bipolar, manic depressive disorder, depression, borderline personality disorder, anxiety, and PTSD, which also persisted on the day of her arrest.

Plaintiff also had a history of type 1 diabetes diagnosed at age 19. Further, she suffered a previous heart attack due to a drug overdose and had prior back problems, including degenerative disc disease at the time of her arrest. Prior to her arrest, Plaintiff had undergone surgeries on her hand and her foot for diabetic-related issues. Plaintiff is a "pack-a-day" smoker and has been smoking since age 12. Plaintiff further admits that over the years and prior to her arrest, she had problems controlling her diabetes, including hospitalization and a previous episode of ketoacidosis.

In the six months or a year prior to her arrest, Plaintiff was homeless or living in hotel rooms. Plaintiff admits that she was not living at home at the time of her arrest because of her drug use. Plaintiff agrees that her memory is impaired for this period of time because of her illegal drug use. Defendant contends that her memory impairment impacts her testimony as it relates to this incident. At the time of her arrest, Plaintiff was on social security disability due to her previous mental health and physical health issues.

On 08/10/2020, Plaintiff was arrested outside her hotel room by the Montgomery police for possession of a controlled substance (methamphetamine) and taken to the Montgomery County jail. At the time of her arrest, she did not take her insulin to the jail with her.

Upon arriving at the jail, the jail officers placed Plaintiff almost immediately into a holding cell in the front area of the jail near the booking area where the guards sit. Plaintiff was

7

placed by jail officers in the booking cell J2 number 1R-05 due to erratic behavior. When she was brought into the jail, she was not booked into the jail system by the jail officers per standard procedure. Nor did she have her picture taken and did not participate in any initial booking paperwork as she had done in the past when she was booked into jail. Mendoza admits that she was never booked into the jail. Although Plaintiff was initially placed in the booking cell near the front of the jail where the jail officer sat, she states that she was subsequently moved by the jail officers to another cell in the "way back area" of the jail. Jail records show this cell number was J2 Tier 1B.

During Plaintiff's initial night at the jail medical personnel Kelisha Thomas, employed by QCHC, Inc. saw her four times. Plaintiff specifically recalls interacting with medical personnel on three occasions before she was moved to the back of the jail out of sight of booking. Thomas was on duty when Plaintiff was brought into around midnight until around midnight until around 6:30 a.m. that same day she didn't work that jail building the following days.

Due to Mendoza's behavior and refusal to have a full physical assessment done, as well as the fact that the jail officers never booked Mendoza into the jail, normal paperwork done by the jail and by the nurse was not done.

However, Mendoza did sign a consent to treat that allowed QCHC Nurse Kelisha Thomas to treat Plaintiff while she was in the booking cell on August 11, 2020, for her diabetes. Per the Standard of Care, Thomas did the following. Thomas initially determined that Mendoza was a Type I insulin-dependent diabetic, and her insulin regimen included the use of regular insulin. After Mendoza executed the Consent to Treatment form, Thomas checked Plaintiff's blood sugar level. Mendoza's blood sugar level was over 200, and as a result, Thomas contacted Dr. Andrews, the on-call physician, for instructions for treatment. Dr. Andrews prescribed 10 units of a regular insulin, which was the proper type of insulin per Plaintiff's own CVS prescription

8

records as prescribed by her doctor approximately a week before her arrest. Humalin is a regular insulin. Regular insulins are also interchangeable. Thomas then administered a dose of regular insulin from the jail's supply to Mendoza in the booking cell as ordered by Dr. Andrews.

Nurse Thomas attempted to take a complete initial assessment of Mendoza including a medical history, urinalysis, COVID test, drug test, pregnancy test, and additional vital signs, but Mendoza refused most of this, other than inmates who are on other things often refuse a urine test which can detect drugs in their system. Mendoza did allow Thomas to take her oxygen levels, her respiration and her heart rate, which were normal.

After administering insulin, Thomas waited 15 to 30 minutes and repeated the blood sugar check obtaining a result of 60. As this is a low level, Thomas provided Mendoza with a sandwich per the medical Standard of Care to try and get her blood sugar up. Due to her low insulin level, Thomas contacted Dr. Andrews again at home. Dr. Andrews instructed Thomas to request the jail to send Mendoza to the hospital for monitoring since the insulin by injection wasn't effective. Thomas also took a third blood sugar level that resulted in a blood sugar reading of over 200 which is not normal. Some diabetics have difficulty controlling their blood sugar levels as Mendoza did, even with insulin.

Per jail policy, Thomas told a jail officer that Mendoza needed to be sent to the hospital for monitoring per physician's orders. The jail is the entity responsible for getting the inmate ready for transfer, assigning officers for the transfer and contacting an ambulance. This is because the jail has control over which officers and how many should go with the inmate for security reasons. They can't just send inmates by themselves to the hospital. Certain protocols are in place to prevent escapes and for the protection of others.

Thomas' shift ended at 6:30 AM on August 11, 2020. Thomas did not have any additional contact with Mendoza on August 12, 2020, or August 13, 2020, as she worked in a

separate building from where Mendoza was being held.

After being moved from the initial holding cell to the cell way in the back away from the front desk, Plaintiff did not have any further contact with medical personnel until she was found unresponsive. Plaintiff has no information or evidence that the nurses were aware that she had been moved to the second cell. Thomas was not aware Mendoza never got transferred to the hospital as requested after she last saw Mendoza. At some point, during the three days Mendoza was at the jail, she was moved back to the front of the jail in a third cell, a booking cell 1B-6 different from the original booking cell. 1B-6 is where she was at the time of transfer to the hospital.

Major Sally Foster discovered on August 13, 2020, Mendoza still had not been fully booked into the facility. She also discovered that Mendoza had been refusing all of her food trays, and it had never been notated on the Daily Activity Log nor was Administration made aware that Mendoza had not been eating. Jail officer Richardson who was assigned to Mendoza received a severe reprimand for insubordination from Foster as a result. Mendoza was then transferred by order of the jail to the hospital.

Booking three days after arresting an inmate was unusual and Richardson was severely reprimanded by Major Foster for not completing the booking process. Booking an inmate is what gets the inmate into the system for processing further medical care, etc.

Thomas and QCHC deny that she breached the Standard of Care as to her treatment of Mendoza. Defendant alleges that many of Mendoza's allegations are false. Mendoza did not scream for help, defecate, or urinate on herself any of the four occasions Thomas saw Plaintiff. Plaintiff never protested getting insulin and never said that the insulin was the wrong type. In fact, it was a regular insulin, the same type of insulin as recently prescribed. Thomas did not have guards and specifically Jeffrey Gourdine hold Plaintiff down to give insulin.

10

Thomas did not do a normal standard booking assessment because Plaintiff would not consent to one. Thomas did not implement a diabetic diet as she did not believe Plaintiff would not be transferred. On her shift, she did give her a sandwich to try and get her blood sugar up. Thomas did not work in the jail area where Mendoza was. She responded to the call because the nurse who did was tied up. Rather, after the jail moved Plaintiff to the back of the jail, jailers did not feed her according to its own documentation. No nurse was aware of that.

Thomas wrote down Plaintiff's blood sugar levels which never got saved int the jail's electronic system due to the jail's failure to book Plaintiff into the jail.

Plaintiff's claim for Medical Malpractice fails because Plaintiff cannot present substantial evidence of a breach of the Standard of Care by QCHC, Nurse Thomas, James, or Dr. Andrews or that Plaintiff's alleged injuries were caused by QCHC's or its employees' actions or omissions. Causes of ketoacidosis include drug use and uncontrolled insulin. Plaintiff had ketoacidosis in the past before she was incarcerated. Plaintiff provides no expert testimony to support her claims for the breach of the Standard of Care or that an alleged breach caused Plaintiff's injury.

Dr. Andrews' orders were appropriate, timely, and did not breach the Standard of Care. Nurse Thomas communicated his orders to the jail staff and her nursing supervisor.

Plaintiff's claim for Deliberate Indifference fails as there will be no evidence QCHC as a company knew of any jail practice not to send an inmate to the hospital when ordered by a doctor. It can't acquiesce in an alleged policy it was not aware of.

5. **STIPULATIONS BY AND BETWEEN THE PARTIES**:

   a.  Crystal Mendoza was arrested on August 10, 2020, by City of Montgomery police officers and booked into the Montgomery County Jail.
   b.  Medical care at the Montgomery County Jail was provided by a contractor, Quality Correctional Healthcare (QCHC), the Defendant.
   c.  Mendoza is an insulin-dependent diabetic. Her diabetes is considered insulin-

        d. resistant, and she has been hospitalized in the past for ketoacidosis, a diabetes complication. Mendoza also takes medications for mental health conditions.

        d. Mendoza was never booked into the jail's computer system.

        e. Mendoza was initially placed in a holding cell near the booking area of the front of the jail.

        f. QCHC nurse Kelisha Thomas treated Mendoza while she was in this holding cell.

        g. Mendoza signed a consent to treatment form presented to Mendoza by Thomas.

        h. Mendoza was later moved to a different cell that was not in the booking area.

**6. MEDIATION:**

The parties mediated the case with Gaynor St. John on January 10, 2024, but the mediation was unsuccessful.

**\*\*\***

**It is ORDERED that:**

**(1) The jury selection and trial of this cause, which is to last five days, are reset for October 27, 2025, at 10:00 a.m., at the United States Courthouse in Montgomery, Alabama;**

**(2) A trial docket will be mailed to counsel for each party approximately two weeks prior to the start of the trial term;**

**(3) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk), three copies of the exhibit list and two extra copies of each photostatically reproducible exhibit. Any publication of exhibits to the**

12

jury will be done through use of the ELMO in the courtroom, and no exhibit is to be shown or published to the jury without it being admitted into evidence.  Any exhibits which the parties wish to use in their opening statements can be shown to the jury if the parties jointly stipulate that the exhibit is admitted into evidence in advance of trial.  With respect to demonstratives, they may be used in voir dire, opening statements, examination of witnesses, and in closing statements if (a) they accurately reflect the evidence, and (b) they have been shown to opposing counsel in advance of trial such that opposing counsel has sufficient time to review the demonstrative and timely raise any objections to the court with respect to the use thereof;

(4) Trial briefs ((a) summarizing the evidence to be presented at trial, (b) setting forth the elements of each and every claim and defense at issue and how the evidence does or does not satisfy those elements, and (c) addressing any evidentiary issues that may arise at trial) are required to be filed by October 15, 2025;

(5) All deadlines not otherwise affected by this

13

order will remain as set forth in the uniform scheduling order (Doc. 20, as modified); and

(6) All understandings, agreements, deadlines, and stipulations contained in this pretrial order shall be binding on all parties unless this order be hereafter modified by order of the court.

DONE, this the 11th day of July, 2025.

                                       /s/ Myron H. Thompson
                                   **UNITED STATES DISTRICT JUDGE**