IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

CRYSTAL MENDOZA,               )
                               )
        Plaintiff,             )
                               )        CIVIL ACTION NO.
        v.                     )        2:22cv477-MHT
                               )           (WO)
QCHC, INC.,                    )
                               )
        Defendant.             )

## OPINION AND ORDER

Plaintiff Crystal Mendoza alleges in this lawsuit that defendant QCHC, Inc. did not provide her with adequate healthcare services while she was detained in the county jail in Montgomery, Alabama.  She brings two types of claims.  First, she claims that the company was deliberately indifferent to her serious medical needs in violation of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983.  Second, she claims that the company's healthcare services failed to meet the appropriate standard of medical care in violation of Alabama law.  Jurisdiction is proper under 28 U.S.C.

§ 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental).

Before the court is QCHC's motion for summary judgment. For the reasons below, the motion will be denied to the extent that Mendoza seeks non-physical damages on her simple lack-of-consent claim and granted in all other respects.

## I. LEGAL STANDARD

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When "the record taken as a whole could not lead a rational trier of fact to

2

find for the non-moving party," summary judgment is appropriate. *Id*.


## II. FACTUAL BACKGROUND

The facts, taken in the light most favorable to Mendoza, are as follows.

"QCHC, Inc. is a privately owned company that contracts with correctional facilities to provide healthcare services to inmates." Bates Decl. (Doc. 79-4) ¶ 1. It "had a contract with Montgomery County[, Alabmam] to provide medical services for the Montgomery County jail." *Id*. ¶ 3. As described below, it provided care to Mendoza.

Mendoza receives treatment for Type 1 diabetes, which inhibits her ability to make insulin, a hormone that helps regulate how much glucose (the scientific name for sugar) is in her blood.

While diabetes is dangerous, Mendoza can manage it with three tools: a glucose monitor, glucose, and

3

insulin.  A glucose monitor helps her track her glucose levels to ensure that they are within normal range.  If her levels are too low, she needs to ingest glucose to raise them.  If her levels are too high, she must inject insulin, which helps her break down and store the excess sugar in her blood.

That said, not all insulin is created equal; it comes in many forms.  There are different brands, such as Humulin, Humalog, and Lantus, each of which may affect people differently.  They may also differ as to how quickly they act and how long they stay in an individual's bloodstream.  Some insulin is 'long acting'; it helps regulate blood sugar for an entire day, and, so, it is injected daily.  Another type is 'regular,' which works quicker and is injected, as needed, when an individual's glucose levels are, or will soon be, too high.

Mendoza has used various types of insulin over the course of her life.  For starters, she took Lantus, a long-acting insulin, once a day.  She was also prescribed

a regular insulin, and, for a while, took Humulin.  In
in early August 2020, her prescription switched to
Humalog, a different regular insulin.

On August 10, 2020, about a week after Mendoza
switched her regular insulin to Humalog, she was arrested
and taken to the Montgomery County Jail.  She was
immediately placed in a holding cell close to the jail
officers' station.

Mendoza needed insulin shortly after her arrival,
and asked for a nurse.  The guards called over Kelisha
Thomas, a nurse employed by QCHC, and another unnamed
nurse.  The nurses took Mendoza from her cell to a small
medical room, and asked her about her medical history.
She responded that she is diabetic and prescribed Lantus
and Humalog for her diabetes.  Thomas gave Mendoza a
consent form to treat her diabetes, and Mendoza signed
it.  Mendoza was then returned to her cell.

Things took a turn for the worse around midnight,
when Mendoza began experiencing severe pain.  Writhing

in agony, she started banging on her cell door and asking the guards to get her insulin or let her call and ask her husband to bring insulin to the jail. The guards contacted Nurse Thomas, who went into Mendoza's cell with several guards. Upon seeing Thomas, Mendoza began screaming for insulin and exclaiming that she was worried she was going to die. Believing that she was "acting up," Thomas left without checking Mendoza's glucose levels. Mendoza Depo. (Doc. 83-1) 143:5.

A little while later, Nurse Thomas returned with a glucose meter to check Mendoza's glucose levels, which were high. Thomas called the doctor on call to notify him of Mendoza's levels, and he ordered Thomas to give Mendoza a dose of regular insulin. Thomas obtained Humulin. But as she went to inject it, Mendoza refused and stated that she took Humalog, not Humulin. Jail guards then held Mendoza down as Thomas forcibly injected her with Humulin. After 30 minutes, her glucose levels

6

began dropping rapidly, eventually falling below 60 mg/dL, the lowest number the monitor could read.

Given the rapid drop, Thomas contacted the on-call doctor once more, and he told her to send Mendoza to the hospital. Thomas relayed the orders to the jail officer in charge of transfers. The officer refused to send Mendoza to the hospital.

Over the next two days Mendoza was in pain, screamed for help, and had difficulties walking and controlling her bladder. A nurse never returned, and the guards, annoyed with hearing Mendoza's complaints, transferred her to a cell in the back of the jail.

Two days after the doctor ordered that Mendoza be sent to the hospital, she was taken to one. While at the hospital, she needed help functioning, was put on a ventilator, and dealt with bedsores. She also received extensive medical care after her hospitalization. Ever since her time in jail, she has experienced emotional distress.

7

### III. DISCUSSION

#### A. The § 1983 Claim

The court will begin with Mendoza's § 1983 claim. Section 1983 prohibits "[e]very person" from violating another's constitutional rights under color of state law. 42 U.S.C. § 1983. The Supreme Court has held that 'municipalities' are 'persons' under the statute. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687-89 (1978). But unlike many other statutes, § 1983 does not make municipalities vicariously liable for their agents' conduct. *See id.* at 694. "Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that [her] constitutional rights were violated; (2) that the municipality had a *custom or policy* that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (emphasis added).

8

"When a private entity ... contracts with a county
to provide medical services to inmates, it ... becomes
the functional equivalent of the municipality." *Buckner
v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). QCHC is,
therefore, the functional equivalent of a municipality
under § 1983.

Mendoza contends that QCHC had a 'custom' of not
sending patients to the hospital, and that, as a result
of this custom, the company violated her right to due
process of law.

The problem with Mendoza's claim is that she has
provided no evidence that QCHC had such a custom. To
establish a custom, a plaintiff "must show that the
[defendant] has authority and responsibility over the
governmental function in issue." *Grech v. Clayton Cnty.*,
335 F.3d 1326, 1330 (11th Cir. 2003). Mendoza has
provided no evidence that the company was responsible for
transporting inmates to the hospital or in any way
hindered such transport. Rather, the evidence reflects

9

that the jail was responsible for transporting patients, and it was the jail's officers who refused to send patients, including Mendoza, to the hospital despite the requests of QCHC's doctors.  QCHC is entitled to summary judgment on Mendoza's § 1983 claim

## B. The State Claims

The court now turns to Mendoza's state claims.

### 1.

Mendoza claims that, while acting within the scope of her employment, Nurse Thomas failed to provide Mendoza with adequate medical care in violation of the Alabama Medical Liability Act, also known as the AMLA.  Under Alabama law, claims brought against 'healthcare providers' that arise out of the provision of medical services are governed by the AMLA.  *See Ex parte Vanderwal*, 201 So. 3d 525, 537 (Ala. 2015).

Healthcare providers include "[a]ny professional

corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services." Ala. Code § 6-5-481 (8). QCHC qualifies as a professional corporation involved in the delivery of healthcare services and thus is subject to the AMLA.

Unlike § 1983, which as explained above required that QCHC have a custom or practice to held liable, the AMLA renders corporations vicariously liable for "the torts of [their] agent[s] if the tortious acts are committed within the line and scope of [their] employment." *Bain v. Colbert Cnty. Nw. Ala. Health Care Auth.*, 233 So. 3d 945, 955 (Ala. 2017) (internal quotation marks omitted). QCHC does not dispute that Nurse Thomas was acting within the scope of her employment when she treated Mendoza. Therefore, the only question is whether Thomas's actions violated the AMLA.

The AMLA "imposes a legal duty upon [healthcare providers] to exercise the degree of reasonable care,

11

diligence, and skill that reasonably competent
[healthcare providers] in the national medical community
would ordinarily exercise when acting in the same or
similar circumstances." *Bradford v. McGee*, 534 So. 2d
1076, 1079 (Ala. 1988).

"To recover damages for an alleged breach of [the
AMLA], a plaintiff must produce evidence that establishes
... the appropriate standard of care, ... the [healthcare
provider's] deviation from that standard, and ... a
proximate causal connection between the [healthcare
provider's] act or omission constituting the breach and
the injury sustained by the plaintiff." *Bradford*, 534
So. 2d at 1079 (citations omitted). "Generally, a
plaintiff must establish these prima facie elements by
introducing expert testimony." *Id.* at 1080. But "[a]
narrow exception to this rule exists in a case where want
of skill or lack of care is so apparent ... as to be
understood by a layman, and requires only common
knowledge and experience to understand it." *Ex parte*

*Healthsouth Corp.*, 851 So. 2d 33, 38 (Ala. 2002) (internal citation and quotation marks omitted).


2.

As to Mendoza's ALMA claim, critical evidence is missing: expert testimony.

Mendoza contends that Nurse Thomas failed to provide appropriate medical treatment, in that she failed to give her the appropriate insulin and that she failed to follow-up with adequate treatment, all of which led to her suffering severe physical and non-physical injuries. However, surprisingly and inexplicably, Mendoza has failed to present expert testimony on this claim at all!

Whether Thomas failed to provide adequate medical treatment as alleged by Mendoza is not a matter that falls within that "narrow exception ... 'where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it.'" *Ex parte*

13

*Healthsouth Corp.*, 851 So. 2d at 38 (internal citation and quotation marks omitted).  This court is without expert testimony on the relevant issues, including whether the difference between the insulin Mendoza received and wanted was a difference that made a difference and, if so, was the proximate cause her physical injuries; whether Nurse Thomas's actions after the insulin injection breached the required standard of medical care and, if so, was the proximate cause Mendoza's physical injuries; whether the treatment by the officers at the jail or the staff at the hospital was the real proximate cause Mendoza's physical injuries; and, in general, whether the physical injuries that Mendoza suffered were simply the result of her unfortunate illness and not due to anything Thomas did or did not do.  Because of the lack of expert testimony, Mendoza cannot recover for her physical injuries.

Mendoza seeks to recover, however, more than just for physical injuries.  She seeks to recover non-physical

damages (including, damages for emotional distress, nominal damages, etc.) as well.   Alabama law is clear that a plaintiff cannot recover non-physical damages under the AMLA for inadequate medical care without first proving physical damages.

In *Looney v. Moore*, 886 F.3d 1058, 1068-69 (2018), the Eleventh Circuit Court of Appeals observed that, to recover on a 'medical malpractice' claim under the AMLA, a plaintiff must, as a predicate, prove a physical injury.   As this court explains in more detail later, non-physical injury, by itself, is not enough to establish liability.

QCHC is entitled to summary judgment on Mendoza's AMLA claim to the extent she claims that Nurse Thomas, in general, failed to provide adequate medical treatment.

3.

15

However, Mendoza presents another claim that is more problematic for QCHC: that Nurse Thomas injected her with a type of insulin *without her consent*. QCHC initially argued that Mendoza's failure-to-consent claim was inadequately pled in the "Medical Negligence," or AMLA, count in her complaint, but, at the pretrial conference in this case, the company abandoned that argument and agreed that the court could resolve the no-consent claim.

Here, Mendoza has provided enough expert testimony for a reasonable jury to conclude that Nurse Thomas deviated from the appropriate standard of care by injecting Mendoza with a certain type of insulin without her consent, and that expert testimony comes from Thomas herself. Thomas has testified that the appropriate standard of care prohibited her from forcibly and without consent injecting Mendoza with insulin. Mendoza represents that Thomas, with the help of jail guards, forcibly and without her consent, held her down and injected her with the insulin she did not want. If a

jury were to believe Mendoza, the jury could further reasonably conclude that Thomas's actions deviated from the standard of care.

However, to recover on her no-consent claim, Mendoza must establish damages. As explained above, the court is without expert testimony on whether the difference between the insulin Mendoza received and wanted was the proximate cause her physical injuries. For all that is within the court's lay knowledge, as explained above, the difference made no difference. In the absence of expert testimony, as is true here, Mendoza cannot recover physical damages on her lack-of-consent claim.

However, Mendoza seeks non-physical damages as well. Whether she can recover such damages on her no-consent claim is more complex.

Alabama recognizes two types of lack-of-consent claims: simple lack of consent (or no-consent at all) and lack of *informed* consent. Here, Mendoza asserts a simple no-consent claim.

The difference between the two types of claims is critical here.  In *Looney,* discussed above, the Eleventh Circuit confronted the question whether, for a plaintiff to recover at all on a lack-of-informed-consent claim, she must, as a predicate, prove an actual physical injury.  After the Alabama Supreme Court refused to answer that question, as certified by the Eleventh Circuit, the circuit court itself had to make an educated guess at an answer.  The court began by looking at 'medical malpractice' claims which, as explained above, require a plaintiff to prove a physical injury to establish liability, *see* 886 F.3d at 1065-66, and, after surveying Alabama law, explained that, while malpractice and informed-consent claims are distinct, the physical-injury predicate requirement should apply to both because they are both 'negligence' actions, and "Alabama law requires an actual injury for negligence claims."  *Id.* at 1069.  The court then further reasoned that, for an informed-consent claim, the plaintiff cannot

18

recover *non-physical* damages (including, damages for emotional distress, nominal damages, etc.) without first proving physical damages injury.  The *Looney* court did not reach, however, the question whether, as to a simple no-consent claim, a plaintiff may recover non-physical damages in the absence of physical damages.

This court must now reach that question.  In *Looney*, the Eleventh Circuit wrote:  "In *Cain v. Howorth*, 877 So.2d 566 (Ala. 2003), citing to a body of caselaw from other jurisdictions, the Alabama Supreme Court recognized that '[t]he law distinguishes between a total lack of consent for the contested act (battery) and the lack of informed consent (negligence).' *Id*. at 580–81 (internal quotation marks omitted)."  886 F.3d at 1068.  In reaching this distinction, the Alabama Supreme Court in *Cain* highlighted a number of helpful legal gobbets, including these:  First, "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented.  When the patient

gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present." 877 So.2d at 580 (internal citation and quotation marks omitted). Second, "'lack of informed consent' ... require[es] ... proof that the doctor failed to inform the patient of the 'significant perils' or 'all material risks,' associated with the procedure for which consent was given." *Id*. at 581 (internal citation and quotation marks omitted). Third, "this is not a case of 'informed' consent where the question is whether the patient would have consented if all known risks had been disclosed; rather, it is a question of whether she consented at all to the injury-producing procedure, which was significantly different from the ... procedure[ ] to which she concededly did consent." *Id.* at 580 (internal citation and quotation marks omitted). And, finally, the *Cain* court concluded "that genuine issues of material fact existed as to all elements of Cain's claim that [the

20

medical procedure] was performed without her consent, and the summary judgment as to that claim was not warranted." *Id.* at 582.

In *Looney*, where the issue was a lack-of-informed-consent, the Eleventh Circuit similarly emphasized that that claim turned on whether the plaintiff had the "complete information" or "enough information," whether the plaintiff's consent was "intelligently given," or whether there were "inadequacies of disclosure." 886 F.3d at 1068 and n. 9 (internal citations and quotation marks omitted).

Here, the claim presented by Mendoza does not turn on whether she had the "complete information" or "enough information," or whether her consent was "intelligently given," or whether there were "inadequacies of disclosure." 886 F.3d at 1068 and n. 9 (internal citations and quotation marks omitted). Rather, she contends that there was no consent, that is, "a total lack of consent for the contested act (*battery*)." *Cain*,

877 So.2d at 580-81 (emphasis added) (internal quotation marks omitted).

To be sure, QCHC argues that Mendoza cannot plead a lack of consent because she signed a consent form.  The form, however, states that she "may withdraw [her] consent to any specific treatment by *refusing the treatment* or test."  Def.'s Appendix (Doc. 85-1) Ex. G (emphasis added).  Here, Mendoza says she did just that when she expressly "refus[ed] the treatment," that is, the type of insulin Nurse Thomas injected into her.  It is for a factfinder jury to decide whether to believe Mendoza and conclude she withdrew her consent.

This court now concludes that, in the circumstances presented here, a factfinder could conclude that, where Mendoza made clear that she did not want the insulin Nurse Thomas had and where, despite her expressed refusal, Nurse Thomas, with the assistance of jail guards, physically and forcefully held Mendoza down and injected that insulin into her, Mendoza has established

22

a no-consent claim.  Therefore, as the Alabama Supreme Court stated in *Cain*, a factfinder could find that the medical procedure "was performed without her consent ... and the summary judgment as to that claim [is] not warranted."  877 So.2d at 582.

Because Mendoza's simple no-consent claim is a medical-battery claim she need not prove actual physical damages to recover non-physical damages (including, damages for emotional distress, nominal damages, etc.), damages which she seeks to recover here.  Under the traditional common-law rule, while negligence actions require a plaintiff to prove a physical injury, intentional torts, such as battery, usually do not.  *See* Restatement (Second) of Torts § 907 cmts. a-c (A.L.I. 1979).  Instead, a nominal injury is presumed when a plaintiff shows that the defendant breached its duty.  *See id.*  Alabama follows that rule.  *See*, *e.g.*, *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).  And AMLA's text does not indicate that it was meant to

deviate from Alabama's common-law approach.  *See Ex parte Christopher*, 145 So. 3d 60, 65 (Ala. 2013) (discussing the presumption against a change in the common law).

Moreover, requiring a physical injury would be contrary to common sense.  The requirement would permit medical professionals to forcibly drug patients or improperly touch patients, free from tort liability, so long as they do not physically injure their patients.  And, given these concerns over bodily autonomy, other state courts have found that proving such an injury is unnecessary in failure to consent cases.  *See*, *e.g.*, *Mohr v. Williams*, 95 Minn. 261, 270-71 (1905), *overruled on other grounds by Genzel v. Halvorson*, 248 Minn. 527 (1957); *Schloendorff v. Soc'y of New York Hosp.*, 211 N.Y. 125, 129 (1914) (Cardozo, J.), *abrogated on other grounds by Bing v. Thunig*, 2 N.Y.2d 656 (1957).

Here, a jury could reasonably find that Nurse Thomas, with the help of jail guards, physically and forcefully injected Mendoza with a drug Mendoza had expressly

24

refused and, thus, committed a battery on her.  *See* Cain, 877 So.2d at 580 ("The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented.  When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present.") (internal citation and quotation marks omitted).  With a battery, a nominal injury is presumed.  *See Surrency*, 489 So. 2d at 1104.  Mendoza also represents that she experienced emotional distress because of the events at the jail.  If a jury believes her, it could reasonably conclude that Thomas caused Mendoza's distress.  *See S. Bakeries, Inc. v. Knipp*, 852 So. 2d 712, 716 n.7 (Ala. 2002); Restatement (Second) of Torts § 905(b) & cmt. b (A.L.I. 1979).


***

     For the reasons above, it is ORDERED as follows:

25

    (1) Defendant QCHC, Inc.'s motion for summary judgment (Doc. 77) motion is denied as to plaintiff Crystal Mendoza's simple lack-of-consent claim, albeit only to the extent she seeks non-physical damages. Only this aspect of her case will go to trial.

    (2) The motion is granted in all other respects, and judgment is entered in favor of defendant QCHC, Inc. and against plaintiff Mendoza in these respects.

DONE, this the 2nd day of September, 2025.

                    /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE